**AMERICAN FAMILY ASSOCIATION, INC.; Donald Wildmon; Kerusso Ministries; Family Research Council,** Plaintiffs–Appellants,

v.

**CITY AND COUNTY OF SAN FRANCISCO; Leslie Katz, in her capacity as a member of the San Francisco Board of Supervisors,** Defendants–Appellees.

No. 00–16415.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 2001

Filed Jan. 16, 2002

Brian Fahling and Stephen M. Crampton, AFA Center for Law & Policy, Tupelo, Mississippi, and Peter Hagberg, Oakland, California, for the appellants.

Louise H. Renne, City Attorney, Randy Riddle, Ellen Forman, Teresa L. Stricker, Rafal Ofierski, Deputy City Attorneys, San Francisco, California, for appellees City and County of San Francisco and Leslie R. Katz.

Before: NOONAN, HAWKINS, and TASHIMA, Circuit Judges.

Opinion by Judge HAWKINS; Dissent by Judge NOONAN

MICHAEL DALY HAWKINS, Circuit Judge:

American Family Association, Inc., Donald E. Wildmon, Kerusso Ministries and Family Research Council (collectively, "Plaintiffs") appeal the district court's dismissal of their Section 1983 action for failure to state a claim. In their complaint, Plaintiffs alleged that the City and County of San Francisco violated the First Amendment and the California Constitution by formally disapproving of an advertising campaign that espoused the view that homosexuality is a sin and that homosexuals could change their sexual orientation. Because the defendants' actions did not violate the First Amendment, we affirm.

## FACTS AND PROCEDURAL HISTORY

Plaintiffs joined other religious groups in sponsoring an advertising campaign called "Truth in Love." In connection with

the campaign, a full page advertisement was carried in the San Francisco Chronicle in 1998. The ad proclaimed that Christians love homosexuals, but that "God abhors any form of sexual sin," whether it is homosexuality, premarital sex or adultery. The ad recognized that a strong same-sex urge drives homosexuality, but stated that everyone "makes a choice in yielding to temptation." It claimed that many have walked out of homosexuality into sexual celibacy or even marriage through the help of Jesus Christ, and depicted a recent gathering of a nationwide ex-gay ministry organization. The ad stated:

For years, Christians have taken a stand in the public square against aggressive homosexual activism. We've paid a heavy price, with sound-bite labels like "bigot" and "homophobe." But all along we've had a hand extended, something largely unreported in the media ... an open hand that offers healing for homosexuals, not harassment. We want reason in this debate, not rhetoric. And we want to share the hope we have in Christ, for those who feel acceptance of homosexuality is their only hope.

The ad also indicated that the Christian groups wanted to help people to reject self-destructive behavior. It quoted statistics that homosexual behavior "accounts for a disproportionate number of sexually transmitted diseases," that "65% of all reported AIDS cases among males since 1981 have been men engaged in homosexual behavior" and that "homosexual youth are twenty-three times more likely to contract STD's than heterosexuals." The ad also claimed that studies revealed a high degree of destructive behavior among homosexuals, including "alcohol, drug abuse and emotional and physical violence."

On October 19, 1998, the San Francisco Board of Supervisors sent a letter to Plaintiffs,[1] the body of which read:

Supervisor Leslie Katz denounces your hateful rhetoric against gays, lesbians and transgendered people.

What happened to Matthew Shepard is in part due to the message being espoused by your groups that gays and lesbians are not worthy of the most basic equal rights and treatment.

It is not an exaggeration to say that there is a direct correlation between these acts of discrimination, such as when gays and lesbians are called sinful and when major religious organizations say they can change if they tried, and the horrible crimes committed against gays and lesbians.

The City and County of San Francisco also adopted two resolutions. The first, Resolution No. 234–99, condemned the murder of Billy Jack Gaither in Alabama following a reported unwanted gay sexual advance, and urged Alabama lawmakers to extend their hate crimes legislation to include offenses related to sexual orientation. The final paragraph of the Resolution "calls for the Religious Right to take accountability for the impact of their longstanding rhetoric denouncing gays and lesbians, which leads to a climate of mistrust and discrimination that can open the door to horrible crimes such as those committed against Mr. Gaither."

The second resolution, No. 873–98, was specifically directed at "anti-gay" television advertisements. It recited that a coalition had introduced a nationwide television advertisement campaign to encourage gays and lesbians to change their sexual orientation, and listed one of the Plaintiffs by

---

**1.** The letter was also addressed to Newt Gingrich, Trent Lott and Jesse Helms, who are not plaintiffs in the appeal.

name. The resolution asserted that the organizations "promote an agenda which denies basic equal rights for gays and lesbians and routinely state their opposition to toleration of gay and lesbian citizens" and stated that a "prominent San Francisco newspaper" chose to accept and publish a printed advertisement campaign. The resolution contended that "the vast majority of medical, psychological and sociological evidence supports the conclusion that sexual orientation can not be changed" and that ads insinuating as much are "erroneous and full of lies." The resolution also stated that ads suggesting gays or lesbians are "immoral and undesirable create an atmosphere which validates oppression of gays and lesbians" and encourages maltreatment of them. The Resolution claimed a "marked increase in anti-gay violence" that coincided with "defamatory and erroneous campaigns" against gays and lesbians. It then urged "local television stations not to broadcast advertising campaigns aimed at 'converting' homosexuals."

Following receipt of the letter and passage of the resolutions, Plaintiffs brought a Section 1983 action in district court against the City and County of San Francisco and Leslie Katz in her official capacity (collectively, the "Defendants"), alleging violations of the First and Fourteenth Amendments of the United States Constitution as well as certain provisions of the California Constitution. Plaintiffs alleged three causes of action: (1) a violation of the Establishment Clause, alleging San Francisco's actions disapproved of a particular religion; (2) a violation of the Free Exercise Clause, violating their right to free exercise of religion; and (3) a "hybrid" cause of action, violating their rights to free exercise of religion and chilling the exercise of their free speech rights. The Plaintiffs sought an injunction prohibiting the Defendants from "making any further official pronouncements or declarations against Plaintiffs or any other groups or

individuals whose religious beliefs include the belief that homosexuality is sinful and that homosexuals can change their homosexual practices," nominal damages and litigation costs.

Defendants moved to dismiss the Plaintiffs' claims under the federal and California Constitutions under Fed.R.Civ. P. 12(b)(6). The district court dismissed most of Plaintiffs' claims without leave to amend, but dismissed the Establishment Clause claim with leave to amend. Plaintiffs notified the court that they did not intend to file an amended complaint, and the court dismissed the entire action with prejudice. This appeal followed.

## STANDARD OF REVIEW

■ This court reviews de novo a district court's dismissal for failure to state a claim pursuant to Rule 12(b)(6). *TwoRivers v. Lewis,* 174 F.3d 987, 991 (9th Cir. 1999). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Burgert v. Lokelani Bernice Pauahi Bishop Trust,* 200 F.3d 661, 663 (9th Cir.2000). A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. *Williamson v. General Dynamics Corp.,* 208 F.3d 1144, 1149 (9th Cir.), *cert. denied,* 531 U.S. 929, 121 S.Ct. 309, 148 L.Ed.2d 247 (2000).

## DISCUSSION

### I. Establishment Clause

#### A. *The Lemon Test*

■ The Establishment Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. This clause applies not only to official condone-

ment of a particular religion or religious belief, but also to official disapproval or hostility towards religion. *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ("In our Establishment Clause cases we have often stated the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or religion in general."); *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1396 (9th Cir.1994) ("the Establishment Clause is ... violated as much by government disapproval of religion as it is by government approval of religion.").

 In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court established the now widely known *"Lemon* test" for analyzing government conduct under the Establishment Clause of the First Amendment. To survive the test, the government conduct at issue must (1) have a secular purpose, (2) not have as its principal or primary effect advancing or inhibiting religion and (3) not foster an excessive government entanglement with religion. *Id.* at 612–13, 91 S.Ct. 2105. Although the *Lemon* test is perhaps most frequently used in cases involving government allegedly giving *preference* to a religion, the *Lemon* test accommodates the analysis of a claim brought under a hostility to religion theory as well. *See Vernon,* 27 F.3d at 1396 (applying *Lemon* test to claim that City of Los Angeles was hostile to plaintiff's religious beliefs). In conducting the *Lemon* analysis, we recognize that it is not our role to determine the factual correctness of the Plaintiffs' assertion that homosexual behavior can be changed, or of the Defendants' assertion that advertisements like the one used by the Plaintiffs contribute to a climate of violence.

### 1. Secular Purpose

 "The purpose prong of the Lemon test asks whether government's actual purpose is to endorse or disapprove of religion." *Kreisner v. City of San Diego,* 1 F.3d 775, 782 (9th Cir.1993) (quoting *Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring)). However, "[a] practice will stumble on the purpose prong 'only if it is motivated *wholly* by an impermissible purpose.'" *Kreisner,* 1 F.3d at 782 (quoting *Bowen v. Kendrick,* 487 U.S. 589, 602, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988)) (emphasis added); *but see Vernon,* 27 F.3d at 1397 (acknowledging Ninth Circuit precedent that any secular purpose suffices, but noting that panel believes Supreme Court test is really that the "actual" or "primary" purpose must be secular).

 Our analysis under this prong focuses purely on *purpose;* we do not question the propriety of the means to achieve that purpose or whether the defendants were correct or even reasonable in the assumptions underlying their actions, such as asserting a connection between the Plaintiffs' ads and an increase in violence against gays. Moreover, "[a] reviewing court must be 'reluctant to attribute unconstitutional motives' to government actors in the face of a plausible secular purpose." *Kreisner,* 1 F.3d at 782 (quoting *Mueller v. Allen,* 463 U.S. 388, 394–95, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983)). We therefore agree with the district court that although the letter and resolutions may appear to contain attacks on the Plaintiffs' religious views, in particular that homosexuality is sinful, there is also a plausible secular purpose in the Defendants' actions—protecting gays and lesbians from violence—and that therefore the Plaintiffs could not state a claim under the purpose prong.

### 2. Primary Effect

■ Under the second prong of the *Lemon* test, we must consider whether the government action has the principal or primary effect of advancing or inhibiting religion. *Lemon*, 403 U.S. at 612, 91 S.Ct. 2105. We conduct this inquiry from the perspective of a "reasonable observer" who is both informed and reasonable. *Kreisner*, 1 F.3d at 784.

Unlike the secular purpose prong, in which it appears that any secular purpose, no matter how minimal, will pass the test, the focus of this prong is on the *primary* effect of the government's conduct. Unfortunately, because it is far more typical for an Establishment Clause case to challenge instances in which the government has done something that favors religion or a particular religious group, we have little guidance concerning what constitutes a primary effect of inhibiting religion. The most instructive case in this circuit is *Vernon*, 27 F.3d at 1398–99. In *Vernon*, the City of Los Angeles conducted an investigation into whether an officer's religious views were improperly influencing his performance, including consulting religious elders on matters of policy, thwarting progress of gay and female officers, and refusing to arrest anti-abortion demonstrators. *Id.* at 1389. The court noted that although one might "infer possible city disapproval of his religious beliefs from the direction of the investigation, it could not objectively be construed as the primary focus or effect of the investigation." *Id.* at 1398–99.

■ With respect to the resolution urging Alabama lawmakers to adopt hate crimes legislation, it is fairly easy to conclude that the primary effect of this resolution is not inhibition of religion. Although the resolution contains a provision calling "for the Religious Right to take accountability for the impact of their long-standing rhetoric denouncing gays and lesbians," this provision appears to be more of an afterthought and any disparagement of the Religious Right is not the primary effect of the resolution. Read as a whole, the primary effect is a denouncement of hate crimes and a call for action by the Alabama legislature. A reasonable, informed and objective observer would not view the primary effect of this resolution as inhibition of religion.

■ The other resolution and the letter to the Plaintiffs present a closer question. These documents are directly aimed at the Plaintiffs and both documents contain statements from which it may be inferred that the Defendants are hostile towards the religious view that homosexuality is sinful or immoral. Nonetheless, we believe the district court properly concluded that this was not the principal effect of the Defendants' actions. The documents, read in context as a whole, are primarily geared toward promoting equality for gays and discouraging violence against them. A number of the Defendants' statements are merely rebuttals of medical and psychological evidence cited by the Plaintiffs in their advertisement and not criticisms of the Plaintiffs' underlying religious beliefs. Certainly, the letter and resolution may contain over-generalizations about the Religious Right, at times misconstrue the Plaintiffs' message, and may be based on a tenuous perceived connection between the Plaintiffs' advertisements and the increase in violence against gays and lesbians. This does not, however, make religious hostility the primary effect of the Defendants' actions. Again, our job is not to question the validity of the Defendants' assumptions or the wisdom of their corresponding actions; rather, it is to determine the constitutionality of those actions. We believe a reasonable, objective observer would view the primary effect of these

documents as encouraging equal rights for gays and discouraging hate crimes, and any statements from which disapproval can be inferred only incidental and ancillary. *See Vernon,* 27 F.3d at 1398–99.

### 3. *Excessive entanglement*

■ The excessive entanglement prong does not easily fit the current case. Plaintiffs argue that the Defendants' actions have encouraged political divisiveness along religious lines and that this is sufficient to constitute excessive entanglement with religion. Political divisiveness, however, "has never been relied upon as an independent ground for holding a government practice unconstitutional." *Brown v. Woodland Joint Unified School Dist.,* 27 F.3d 1373, 1383 (9th Cir.1994) (internal citation and quotation omitted). Although Plaintiffs contend that homosexuality is an "emotionally explosive" issue that engenders political divisiveness, if this were enough to create an Establishment Clause violation on entanglement grounds, government bodies would be at risk any time they took an action that affected potentially religious issues, including abortion, alcohol use, other sexual issues, etc. *See id.* The district court properly concluded that the Defendants' actions did not create excessive entanglement with religion.

### B. *State constitutional claims*

■ Because the Defendants' actions pass all three prongs of the *Lemon* test, Plaintiffs have failed to state a claim under the Establishment Clause of the United States Constitution. This outcome dictates the result as to the Plaintiffs' state claims as well, because California courts also apply the *Lemon* test when analyzing violations of California's Establishment Clause. *Vernon,* 27 F.3d at 1396. Although California's "No Preference" Clause is sometimes considered more expansive and more protective of the separa-

tion principle than the United States Constitution, we have previously noted that this clause is only interpreted as more expansive when dealing with approval of religion cases, and has not been more expansive in cases involving disfavor of religion. *Id.* at 1402. Plaintiffs have thus also failed to state a claim under the California Constitution.

## II. Free Exercise

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. Const. amend I. Free exercise claims were traditionally analyzed under the balancing test established in *Sherbert v. Verner,* 374 U.S. 398, 402–03, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Under the *Sherbert* test, conduct violates the Free Exercise Clause if it substantially burdens a religious practice and either is not justified by a substantial state interest or is not narrowly tailored to achieve that interest. *Vernon,* 27 F.3d at 1392. The *Sherbert* test was later modified by *Employment Division, Oregon Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), in which the Court held the test did not apply in challenges to neutral, generally applicable criminal laws. The Court then expanded on *Smith* in *Church of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), noting that a free exercise violation hinges on showing that the challenged law is either not neutral or not generally applicable. *Id.* at 531–34, 113 S.Ct. 2217.

■ Plaintiffs contend that in this case they are not required to demonstrate a "substantial burden" on their exercise of religion, and rely heavily on a quote from *Lukumi* that a "law targeting religious beliefs as such is never permissible." *Id.*

at 533, 113 S.Ct. 2217. Plaintiffs overlook a critical distinction, however: in this case, there is no actual "law" at issue. In fact, there does not appear to be any case in this circuit applying *Smith* or *Lukumi* to some non-regulatory or non-compulsory governmental action—in other words, to something other than an actual law. *See, e.g., KDM v. Reedsport School Dist.,* 196 F.3d 1046 (9th Cir.1999) (Oregon regulation requiring special education services to be provided in "religiously neutral settings"); *Miller v. Reed,* 176 F.3d 1202, 1205 (9th Cir.1999) (California Motor Vehicle Code requirements); *Johns v. County of San Diego,* 114 F.3d 874, 877 (9th Cir. 1997) (requirement that non-attorney parent must be represented by counsel when bringing action on child's behalf).

■ In *Vernon,* a post-*Smith* case, we continued to apply the *Sherbert* substantial burden test to government conduct that did not involve an actual regulation or criminal law. *See Vernon,* 27 F.3d at 1393 (applying *Sherbert* to challenge to government investigation into whether officer was consulting religious elders on police policy and favoring members of his church). In this case, Plaintiffs allege in the complaint that the Defendants' actions violated their free exercise rights and chilled the exercise of their free speech rights.[2] We have previously explained, however, that when the challenged government action is neither regulatory, proscriptive or compulsory, alleging a subjective chilling effect on free exercise rights is not sufficient to constitute a substantial burden. *Vernon,* 27 F.3d at 1394; *see also Laird v. Tatum,* 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). The complaint does not otherwise allege any specific religious conduct that was affected by the Defendants' actions. The Plaintiffs have therefore failed to state a viable constitutional claim under the Free Exercise Clause of the United States Constitution or under the California Constitution. *See Vernon,* 27 F.3d at 1392 (discussing California's incorporation of federal law).

## III. Hybrid Claim

■ In *Smith,* the Supreme Court noted that free exercise claims implicating other constitutional protections, such as free speech, could qualify for strict scrutiny review even if the challenged law is neutral and generally applicable. 494 U.S. at 881–82, 110 S.Ct. 1595. In this circuit, to make out a hybrid claim, a "free exercise plaintiff must make out a colorable claim that a companion right has been violated." *Miller,* 176 F.3d at 1207 (internal quotation and citation omitted).

### A. *Orthodoxy of Belief*

The Plaintiffs' first free speech argument is that the Defendants have prescribed an orthodoxy of belief on the subject of homosexuality. Although Plaintiffs correctly cite dozens of cases for the principle that the government cannot prescribe matters of opinion or belief, all of these authorities involve conduct beyond mere criticism of speech by a governmental authority. *See, e.g., Glickman v. Wileman Brothers & Elliott, Inc.,* 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997) (challenge to compelled advertising assessments); *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (challenge to state court decision that compelled private citizens to permit group in parade); *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (challenge to must-carry provisions of cable television act).

**2.** The free speech issue is discussed in more detail in Section III below.

■ We agree with the host of other circuits that recognize that public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction. *See, e.g., Penthouse Int'l Ltd. v. Meese,* 939 F.2d 1011, 1015–16 (D.C.Cir. 1991) (public officials entitled to criticize publishers of pornography where letter contained no threat or intimation of intent to prosecute or prescribe publisher's conduct); *R.C. Maxwell Co. v. Borough of New Hope,* 735 F.2d 85, 89 (3d Cir.1984) (letters which encouraged but did not threaten or intimidate landowner to terminate lease with billboard owner did not violate billboard owner's First Amendment rights); *Hammerhead Enters., Inc. v. Brezenoff,* 707 F.2d 33, 38–39 (2d Cir.1983) (no violation where public official sent letters to retail stores requesting that they refrain from selling a controversial board game, as comments could not reasonably be interpreted as "intimating that some form of punishment or adverse regulatory action will follow" failure to comply); *cf. Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 68, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) (constitutional violation where Rhode Island commission's conduct amounted to "thinly veiled threats to institute criminal proceedings" against publishers who did not stop circulating publications on commission's list).

■ In this case, although the Defendants may have criticized Plaintiffs' speech (or at least the perceived effect of it) and urged television stations not to air it, there was no sanction or threat of sanction if the Plaintiffs continued to urge conversion of homosexuals or if the television stations failed to adhere to the Defendants' request and aired the advertisements. Therefore, the Plaintiffs have failed to allege a colorable free speech claim and the district court properly dismissed this portion of the hybrid claim.

### B. *Viewpoint Discrimination*

■ The Plaintiffs' viewpoint discrimination claim fails largely for the same reason. In fact, the opening line in this section of their appellate brief demonstrates the problem: "The First Amendment does not permit the City to *impose special prohibitions* on those speakers who express views on disfavored subjects" (emphasis added). Again, the authorities cited by Plaintiff involve sanctions, denial of funding, or some affirmative consequence associated with a particular viewpoint. *See, e.g., Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (University violated First Amendment by refusing to fund Christian student publication while funding other student publications). As with the orthodoxy claim, the Defendants have not imposed or even threatened any prohibitions or sanctions for the Plaintiffs' viewpoint. The district court properly determined that the Plaintiffs had failed to allege a colorable viewpoint discrimination claim and properly dismissed this portion of the hybrid claim as well.

### CONCLUSION

The district court properly dismissed the Plaintiffs' Establishment Clause claim because the Defendants' actions had a plausible secular purpose, did not have the primary effect of inhibiting religion and did not create excessive entanglement with religion. The district court properly dismissed the Plaintiffs' free exercise claim because the Defendants' conduct was neither regulatory nor proscriptive and Plaintiffs alleged no more than a subjective chilling effect on their free exercise of religion. The district court also properly dismissed Plaintiffs' hybrid free exercise/free speech claim because Plaintiffs had not stated a colorable free speech claim in that the Defendants' conduct did

not sanction or threaten to sanction their speech.

AFFIRMED.

NOONAN, Circuit Judge, dissenting:

This case is a skirmish in the culture wars of the last century. Our culture has been the product, at least in part, of Jewish and Christian religious teaching; and the culture wars have, almost inevitably, brought about challenges to that teaching. The plaintiffs here emphasize the religious roots and religious nature of their message. The defendants focus on secular consequences of a message that they nonetheless maintain comes from a religious group using such a fundamentally religious category as sin.

We are not meant to be soldiers in the skirmish. We are asked, as much as it lies within our capabilities, to put aside our own freight of values and to put on the neutrality that our Constitution guarantees government will have in religious controversy. We are not asked to determine the religious or secular truth of the plaintiffs' message or the city's rebuttal. We have no competence to do so.

Not only are we disabled from entering the fray by our judicial role, but the posture of the case prevents us from digging into possibly relevant facts that a trial might disclose. We are ruling on a motion to dismiss for failure to state a cause of action. We are, therefore, confronting not facts but allegations. We are bound to accept the allegations as true. We are bound to read them with all reasonable inferences drawn in favor of the allegators. The opinion of the court fairly and accurately states the standard of review we are obliged to apply. My quarrel is with the way the standard is then applied.

It is also common ground for the panel that the Constitution prohibits official disapproval of, or official hostility towards, religion. Just as the Constitution by pro-tecting the free exercise of religion assures the right of an atheist not to be compelled to swear by God, *Torcaso v. Watkins*, 367 U.S. 488, 495, n. 11, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961), so the Constitution assures religious believers that units of government will not take positions that amount to the establishment of a policy condemning their religious belief.

With agreement, then, as to the nature of our review and the constitutional criteria to be applied, where do the majority opinion and the dissent part company? First, as to the primary effect of the city's letter. The letter states that "what happened to Matthew Shepard" (that is, what is taken to be generally known, Shepard's vicious murder by anti-gay assailants) was "in part due to the message being espoused by your groups." The letter further asserts "a direct correlation" between such an event and calling gays and lesbians "sinful." Similarly, the city's resolution "condemning the hate motivated murder of Billy Jack Gaither" begins with a condemnation of Mr. Gaither's murder and ends with a call on "the Religious Right" to "take accountability" for its rhetoric, which can "open the door to horrible crimes, such as those committed against Mr. Gaither." To assert that a group's religious message and religious categorization of conduct are responsible for murder is to attack the group's religion. The majority says that the city's letter and resolutions "may appear to contain attacks on the religions of the plaintiffs." The way that the city found to rebuke the plaintiffs was to assert that their message was murderous. It is difficult to think of a more direct attack.

The city is saved as to its purpose by its plausible purpose of seeking to reduce violence against gays and lesbians; but this plausible purpose does not neutralize the effect of the means chosen by the city—a means that achieves its effect by its asser-

tion of a direct correlation between the plaintiffs' religious beliefs and the killing of human beings. It is difficult to believe that any informed and reasonable observer could think that the primary effect of the city's message was, "Don't incite violence against gays and lesbians." The city, well aware of the plaintiffs' advertising campaign proclaiming their love for homosexuals, knew that such a conventional admonition would have been brushed off as a bromide with an "Of course not." To reach the plaintiffs, to strike at what the city perceived as a danger, the city had to strike at the heart of the plaintiffs' religious belief, to focus on their belief that the conduct they were trying to change was an offense to God and to make that belief responsible for murder.

Suppose a city council today, in the year 2002, adopted a resolution condemning Islam because its teachings embraced the concept of a holy war and so, the resolution said, were "directly correlated" with the bombing of the World Trade Center. Plausibly the purpose might be to discourage terror bombings. Would any reasonable, informed observer doubt that the primary effect of such an action by a city could be the expression of official hostility to the religion practiced by a billion people?

Consider the actual resolution of the city of Hialeah banning animal sacrifice. The plausible purpose of the resolution was to protect the health of the citizens of the city. Its primary effect was to prohibit ritual required by belief in Santeria. The way the city chose to protect health was to express hostility to a religious belief and inhibit its practice. The means chosen were unconstitutional. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). So here the city had a plausible, indeed laudable purpose, to decrease vicious violence on account of sexual orientation. The city used a means that officially stigmatized a religious belief as productive of murderous consequences.

Both the letter and the resolution explicitly condemn hate crimes. Part of that condemnation is an attribution of responsibility for hate motivating the violence to the plaintiffs. By focusing on these hate crimes, San Francisco condemns both the crime and the source of the hate. The condemnation and the assignment of collective guilt are unmistakably bound together in the letter and the resolution. The majority breaks the connection between condemnation of the crime and assignment of guilt, treating the latter as "an afterthought." While both readings are plausible, in an appeal from a motion to dismiss, drawing all reasonable inferences in favor of the non-moving party, the question cannot be decided at this stage.

A second point of disagreement with the majority: Its opinion states that, although the city urged television stations not to let the plaintiffs' message air, "there was no sanction or threat of sanction ... if the television stations failed to adhere to [the] request." That conclusion is too narrow a reading of the complaint, which states: "Upon information and belief the San Francisco television stations refused Plaintiffs' ads at least in part because of the resolution of the Defendants urging them not to accept ads from Plaintiffs." A fair inference from the allegation is that the television stations were under some compulsion to respond to the city's urging. The allegation of official action blocking access to the air because the city disapproved of the plaintiffs' beliefs is surely sufficient to state a claim of free speech and free exercise of religion denied.

A comprehensive statement of our constitutional commitment to the freedom of ideas from official censorship, correction, or condemnation was made by Robert

Jackson writing for the Supreme Court in *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943): "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion or other matters of opinion...." The plaintiffs have alleged a case where the fixed star has been obscured and an official orthodoxy prescribed.