**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

C.F., by and through his parents
TERESA FARNAN and BILL FARNAN,
        *Plaintiff-Appellant,*

      v.

CAPISTRANO UNIFIED SCHOOL
DISTRICT; DR. JAMES CORBETT,
individually and in his official
capacity as an employee of
Capistrano Unified School District,
        *Defendants-Appellees,*

      and

CALIFORNIA TEACHERS
ASSOCIATION/NEA; CAPISTRANO
UNIFIED EDUCATION ASSOCIATION,
        *Intervenors-Appellees.*

No. 09-56689

D.C. No.
8:07-cv-01434-
JVS-AN

C.F., by and through his parents
TERESA FARNAN and BILL FARNAN,
          *Plaintiff-Appellee,*

          v.

DR. JAMES CORBETT, individually
and in his official capacity as an
employee of Capistrano Unified
School District,
          *Defendant-Appellant,*

          and

CAPISTRANO UNIFIED SCHOOL
DISTRICT,
          *Defendant,*

          and

CALIFORNIA TEACHERS
ASSOCIATION/NEA; CAPISTRANO
UNIFIED EDUCATION ASSOCIATION,
          *Intervenors.*

No. 09-56690

D.C. No.
8:07-cv-01434-JVS-
AN

OPINION

Appeals from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
February 11, 2011—Pasadena, California

Filed August 19, 2011

Before: A. Wallace Tashima and Raymond C. Fisher,
Circuit Judges, and Mark L. Wolf, Chief District Judge.*

Opinion by Judge Fisher

---

*The Honorable Mark L. Wolf, Chief United States District Judge for
the District of Massachusetts, sitting by designation.

**COUNSEL**

Robert H. Tyler and Jennifer L. Monk (argued), Advocates for Faith and Freedom, Murrieta, California, for the plaintiff-appellant-cross-appellee.

Erwin Chemerinsky (argued), U.C. Irvine School of Law, Irvine, California; J. Craig Johnson and Christian A. Hickersberger, Tenner Johnson LLP, Riverside, California, for the defendants-appellees-cross-appellants.

Michael D. Hersh, California Teachers Association, Santa Fe Springs, California; Laura P. Juran and Emmy Leheny, California Teachers Association, Burlingame, California, for the intervenors-appellees.

# OPINION

FISHER, Circuit Judge:

The First Amendment provides that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The government runs afoul of the Establishment Clause through disparagement as well as endorsement of religion. *See Catholic League for Religious & Civil Rights v. City & Cnty. of S.F.*, 624 F.3d 1043, 1060 (9th Cir. 2010) (en banc) (Silverman, J., concurring); *id.* at 1053-54 (Kleinfeld, J., dissenting); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). In this case, a former public high school student alleges that his history teacher violated his rights under the Establishment Clause by making comments during class that were hostile to religion in general, and to Christianity in particular. Mindful that there has never been any prior reported case holding that a teacher violated the Constitution under comparable circumstances, we affirm the district court's conclusion that the teacher is entitled to qualified immunity. Because it is readily apparent that the law was not clearly established at the time of the events in question, and because we may resolve the appeal on that basis alone, we decline to pass upon the constitutionality of the teacher's challenged statements. *See Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815-18 (2009).

## BACKGROUND[1]

In fall 2007, Chad Farnan was a 15-year-old sophomore enrolled in Dr. James Corbett's Advanced Placement European History (AP Euro) class at Capistrano Valley High School. Corbett has taught in the Capistrano Unified School District (District) for more than 20 years, and has taught AP Euro for more than 16 years. He is presently the only teacher

---

[1]The facts are undisputed unless otherwise noted.

who teaches AP Euro at Capistrano Valley High School. Corbett is a Christian who regularly prays and attends church services. Farnan is also a Christian, and believes in creationism. He was offended by comments Corbett made during class that Farnan characterizes as "derogatory, disparaging, and belittling regarding religion and Christianity in particular." Neither Farnan nor his parents ever discussed this concern with Corbett or any other school official. Rather, before completing the first semester of AP Euro, Farnan withdrew from the class and filed this lawsuit under 42 U.S.C. § 1983 alleging a violation of his First Amendment rights under the Establishment Clause. Farnan has since graduated from high school and begun college.

AP Euro is a college-level course for which students can receive college credit if they pass the AP exam administered by the College Board. The AP Euro standards are equivalent to a University of California course. The College Board dictates that AP Euro cover a number of topics touching on religion, including: "[c]hanges in religious thought and institutions," "[s]ecularization of learning and culture," "[s]cientific and technological developments and their consequences," and "[c]hanges in elite and popular culture, such as new attitudes toward religion, the family, work, and ritual." The College Board's course description explains that these "cultural, economic, political, and social developments . . . played a fundamental role in shaping the world in which [we] live," and accordingly provide "context for understanding the development of contemporary institutions, the role of continuity and change in present-day society and politics, and the evolution of current forms of artistic expression and intellectual discourse."

In summer 2007, Corbett sent home a letter to incoming students who had signed up for his AP Euro class, including Farnan. In the letter, Corbett explained how the class would operate: "Most days we will spend a few minutes (sometimes more) at the beginning of class discussing current events . . . .

Discussion will be quite provocative and focus on the 'lessons' of history. My goal is to have you go home with something that will provoke discussion with your parents." Corbett assured students that they "may offer any perspective without concern that anything they say will impact either my attitude toward them or their grades. I encourage a full range of views." Farnan received and read the letter.

Corbett describes his approach as seeking "to teach students to be able to identify central questions and construct logical thesis statements," to "view a variety of historical materials, both analytically and critically, to weigh historical evidence, and to arrive at conclusions based on informed judgment." His "pedagogy is intentionally provocative in order to elicit responses from his students and to help them develop critical thinking skills." He encourages students to "question and try to come up with a[n] analysis of what is true [and] is not true, from [a] historical perspective." Corbett told his AP Euro students that, "it is completely safe, in here anyway, to disagree with me, make a comment, whatever you want to say. I don't care. The only thing you'll get from me in response is, 'On what basis . . . have you come up with this particular perspective?' . . . I mean, there's almost always more than one point of view on stuff."

District Judge Selna's thoughtful decision, *C.F. v. Capistrano Unified Sch. Dist.*, 615 F. Supp. 2d 1137 (C.D. Cal. 2009) ("*Farnan I*"), describes in detail the statements made by Corbett that Farnan takes issue with, and we quote from a selection of them here.[2] Farnan challenges, for example, Cor-

---

[2] These quotations come from transcripts of audio recordings Farnan made during class without Corbett's knowledge. We recognize that Corbett alleges some of the recordings and transcripts have been edited and the statements have been taken out of the context of the classes in which they occurred. *See Farnan I*, 615 F. Supp. 2d at 1141 n.3.

Corbett also suggests that Farnan violated California Education Code section 51512 by recording his lectures without written permission. Because Corbett does not argue that this affects our analysis of this case, we do not address that allegation.

bett's commentary on how religion influenced serfs' reactions to Joseph II's attempts to spearhead reform in the Holy Roman Empire:

> [H]ere is Joseph II. He's trying, for example, to end serfdom. Serfdom in which the peasants, the Ser[f] class, on these estates [were], literally, property. They had no rights to speak of at all. He doesn't just go that far. I mean, he tries to get them land. He . . . really has the interest of this class of people at heart, and the — the reforms that he makes really are going to make the lives of these peasants massively better. So why do the peasants oppose him? . . . Because he also tried to reform religion, and the peasants love their church.
>
> It's the same thing here. You know, you go down to Georgia, Alabama, Mississippi, all these states that are as red as they could possibly be, as right-wing Republican as you could possibly be. [But] [w]hen you first present these people with the economic policies of the Democratic party, they are all Democrats. Virtually all the social programs they like. . . .
>
> How do you get the peasants to oppose something that is in their best interest? Religion. You have to have something that is irrational to counter that rational approach. No problem. . . . [W]hen you put on your Jesus glasses, you can't see the truth. Um, Joseph made these reforms with no consultation, with no consent. (Inaudible) in the state.
>
> Now, the father of modern conservatism is [Edmund] Burke. He's in this chapter. And [Edmund] Burke made a very good point here that Joseph II should have paid attention to. You cannot overturn long-held traditions overnight without causing chaos, you know. You need to approach it by

getting people some education, and you need to move it in a way that gets their support before you do anything. . . .

Farnan also takes issue with statements Corbett made about the relationship between religion and the Scientific Revolution:

[B]y 1543 we got religious wars going on. These are the religious wars that Charles V was involved with with the German princes, right? And those wars are going to end with the peace of Augsburg in 1555. Okay. (Inaudible). [O]kay. So we're talking about the beginnings here, starting at a time of real religious upheaval. . . . But what was the consequence? You know the consequence is that mankind becomes — because of the seismic revolution — a kind of cog in a cosmic clock instead of God's most important creation.

Um, see, people believed before the scientific revolution that the Bible was literal and that anything that happened, God did it. They didn't understand. They didn't have the scientific method. They didn't approach truth. The explanation to everything literally was that God did it. And the ultimate authority . . . was the Bible. . . .

[T]hink how humbling it's going to be, you know, when all these people who have been talking about Adam and Eve and creation and all of this stuff for all that time when eventually something happens, and they find out that there are people on another planet, six billion light years away, who don't look like us, worshipping huge geckos. (Students laughing.)

It's — I mean, it's profoundly disturbing (inaudible). You have (inaudible) people who are deep believers

and find out that maybe we're not so important. Aristotle was a physicist. He said, "No movement without movers." And he argued that, you know, there sort of has to be a God. Of course that's nonsense. I mean, that's what you call deductive reasoning, you know. And you hear it all the time with people who say, "Well, if all this stuff that makes up the universe is here, something must have created it." Faulty logic. Very faulty logic. What's another explanation? . . .

Yeah. The answer is — the other possibility is, it's always been here. . . . Your call as to which one of those notions is scientific and which one is magic. (Inaudible) the spaghetti monster behind the moon. I mean, all I'm saying is that, you know, the people who want to make the argument that God did it, there is as much evidence that God did it as there is that there is a giant spaghetti monster living behind the moon who did it. . . .**³**

Because I can say to you, you know at least one of the laws of physics: Matter, can matter be — [Student: Created or destroyed.] Therefore, no creation, unless you invoke magic. Science doesn't invoke magic. If we can't explain something, we do not uphold that position. It's not, ooh, then magic. That's not the way we work. If we can't find a rational explanation, we go looking for other rational explanations. We do not invoke a supernatural every time we get stymied.

---

**³**Intervenors note that "spaghetti monster" is a term coined by evolution proponents who criticized the logic of teaching "creation science" in public schools. *See, e.g.*, Cornelia Dean, *Helping Out Darwin's Cause With a Little Pointed Humor*, N.Y. Times, Dec. 27, 2005, *available at* http://www.nytimes.com/2005/12/27/science/27evol.html.

It's okay for religious people to, you know, or a magician (inaudible). There may be a distinction, but there is no difference. What was it that Mark Twain said? "Religion was invented when the first con man met the first [fool]."

Anyway, um, he argued that all movement — no movement without a mover in a natural state, all objects at rest. . . . [T]his is deductive logic. It assumes a fact not supported by evidence and then makes logical assumptions based on that fact. Um, but, you know, we use inductive reasoning which requires observation and experimentation. . . .

What happened in 1450 that changed science forever? . . . Remember what I said about those books that were handwritten . . . ? See, this is one of the differences between the real scientists (inaudible) creationism and evolution, you know. What do evolutionary scientists do every day? They try and disprove the theory of evolution. Every time we find something new, we have to see if that fits with the central organizing theory of biology, which is evolution.

The first time a scientist finds something that can't be explained, you know, in evolution, it may not be thrown out, but it is undermined. And, actually, when they do the research, they're not looking to prove evolution. They're looking to disprove it. That's what the moral hypothesis is. You try and disprove it. And the more you try and disprove it and the more you fail, the more you believe it.

Contrast that with creationists. They never try to disprove creationism. They're all running around trying to prove it. That's deduction. It's not science. Scientifically, it's nonsense. In the case of the printing

press, the printing press gives us the opportunity to share ideas. Scientists wrote . . . an essay of some scientific theory that you found, and other people are going to be able to read it. And they'll be able to test what you did and see if it's true . . . .

Farnan also focuses on a statement Corbett made about a lawsuit filed against him and the District nearly 20 years ago by a fellow teacher, John Peloza, who had been directed by the school not to teach creationism in his science class. The suit was ultimately resolved in favor of Corbett and the District in an opinion by this court holding that requiring science teachers to teach evolution does not violate the First Amendment. *See Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 521-22 (9th Cir. 1994) (per curiam). During class a student asked Corbett about the controversy involving Peloza, and Corbett said the following:

I was the adviser to the student newspaper. In his classes, [Peloza] was not telling the kids the scientific truth about evolution. He was hinting to kids in his class that there's another explanation, and he invited kids to his home so they could hear the truth, the Biblical truth about all this. And he came in at lunch and had meetings at lunch with kids who wanted to believe in creationism. And, anyway, my editor wrote an editorial in which she inferred [sic] that [Peloza] was not teaching science in his biology classroom. Instead, he was teaching religion.

He sued me as the advisor to the paper for five million, as a matter of fact. He also, on another issue, sued several other members of the faculty here because he claimed that he had the right under rules of academic freedom, because he was a fully qualified biology teacher, to teach biology any way he saw fit as a qualified teacher. . . .

> [T]he school district hired an attorney to defend us. And at the first meeting, the school district's attorney, my attorney, said, "First thing we need you all to do, we do not need to make any more public statements about this until the lawsuit is over." At that point, I stood up and said, "I'll tell you what. I will sign a statement giving you — you do not have to defend me, but I will not leave John [Peloza] alone to propagandize kids with this religious, superstitious nonsense. . . . John wanted to talk about creation as a science and all that stuff, but you get involved in that argument, you just lose because it's just nonsense. . . .

Based on these statements and others discussed in the district court order, *see Farnan I*, 615 F. Supp. 2d at 1142-53, Farnan filed suit under 42 U.S.C. §§ 1983 and 1988 alleging that Corbett and the District violated the Establishment Clause. He sought declaratory and injunctive relief and nominal damages. Corbett and the District answered the operative first amended complaint in March 2008, but Corbett's answer made no mention of qualified immunity. The following month, the district court granted the motion of the California Teachers Association and Capistrano Unified Education Association to intervene as defendants, and these intervenors filed an answer raising Corbett's entitlement to qualified immunity as an affirmative defense.

The parties filed cross-motions for summary judgment on the constitutionality of the challenged statements in March 2009. Without considering whether Corbett was entitled to qualified immunity, the district court granted Farnan's motion for summary judgment as to the comment regarding John Peloza's lawsuit, but granted summary judgment to the defendants as to all other challenged statements after concluding that they did not violate the Establishment Clause. *See id.* The district court denied Farnan's request for injunctive and declaratory relief. *See C.F. v. Capistrano Unified Sch. Dist.*,

647 F. Supp. 2d 1187, 1199 (C.D. Cal. 2009) ("*Farnan II*"). Corbett subsequently moved to amend the scheduling order and requested leave to file an amended answer asserting the defense of qualified immunity. *See C.F. v. Capistrano Unified Sch. Dist.*, 656 F. Supp. 2d 1190, 1192 (C.D. Cal. 2009) ("*Farnan III*"). The district court granted these motions and ultimately held that, although the Peloza comment violated the Establishment Clause, the law was not clearly established, so Corbett was protected by qualified immunity. *See id.* at 1203-07.

The parties filed timely cross-appeals in October 2009. Farnan challenges the district court's (1) rejection of his Establishment Clause challenge to all the statements except the Peloza comment, (2) refusal to grant him declaratory relief, (3) grant of leave to Corbett to file an amended answer, and (4) grant of qualified immunity to Corbett. Corbett appeals the grant of summary judgment to Farnan as to the unconstitutionality of the Peloza comment. In accordance with the parties' stipulation, Farnan dismissed his appeal as to the District and Corbett in his official capacity, so this appeal pertains only to Farnan's claims against Corbett in his individual capacity.

## DISCUSSION

## I.

The district court had jurisdiction over Farnan's § 1983 action under 28 U.S.C. §§ 1331 and 1343, and we have jurisdiction to hear the cross-appeals under 28 U.S.C. § 1291. We review de novo both the grant of summary judgment and the conclusion that a public employee is entitled to qualified immunity. *See Boyd v. Benton Cnty.*, 374 F.3d 773, 778 (9th Cir. 2004); *Peng v. Penghu*, 335 F.3d 970, 973 (9th Cir. 2003). In evaluating whether summary judgment is appropriate, we determine "whether the district court correctly applied the substantive law" and whether, "view[ing] the evidence in

the light most favorable to the party against whom summary judgment was granted," "any genuine issue of material fact exists." *Oltarzewski v. Ruggiero*, 830 F.2d 136, 138 (9th Cir. 1987). Decisions involving pretrial scheduling orders under Rule 16 and requests for leave to amend an answer are reviewed for abuse of discretion. *See Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001).

## II.

**[1]** Farnan appeals the district court's refusal to grant his request for declaratory relief. We affirm because Farnan's graduation from high school mooted this claim. "Article III of the Constitution requires that there be a live case or controversy at the time that a federal court decides the case." *Burke v. Barnes*, 479 U.S. 361, 363 (1987). "It is well-settled that once a student graduates, he no longer has a live case or controversy justifying declaratory or injunctive relief against a school's action or policy." *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000); *see also DeFunis v. Odegaard*, 416 U.S. 312, 316-19 (1974) (per curiam). Farnan concedes that his declaratory relief claim would be moot under the general rule, but urges us to hold that his case falls into the "capable of repetition, yet evading review" exception.

"That exception, however, is limited to extraordinary cases in which (1) the duration of the challenged action is too short to be fully litigated before it ceases, and (2) there is a reasonable expectation that the plaintiff[ ] will be subjected to the same action again." *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) (en banc) (internal quotation marks omitted); *see also Davis v. FEC*, 554 U.S. 724, 735 (2008) ("Th[e] exception applies where . . . there is a reasonable expectation that the same complaining party will be subject to the same action again.") (internal quotation marks omitted). Because Farnan has graduated, there is no reasonable probability that he will be subjected to the same action again, and "just because this particular case did not reach the

Court until [after Farnan's] graduation," "it hardly follows that the issue he raises will in the future evade review." *DeFunis*, 416 U.S. at 319; *see also Cole*, 228 F.3d at 1098-99; *Doe*, 177 F.3d at 798-99.

Even though Farnan's graduation mooted his claim for declaratory relief, however, his damages claim remains viable. *See Cole*, 228 F.3d at 1099. "[A] 'live claim for [even] nominal damages will prevent dismissal for mootness.' " *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 425 (9th Cir. 2008) (quoting *Bernhardt v. Cnty. of L.A.*, 279 F.3d 862, 871 (9th Cir. 2002)) (alterations in original). Accordingly, we proceed to the merits of the appeal.

## III.

### A.

Before we consider whether Corbett was entitled to qualified immunity, we must address Farnan's argument that the district court erred by permitting Corbett to assert the defense rather than holding that it was waived. Although the intervenors raised the defense on Corbett's behalf in their answer, Corbett did not assert the defense himself until after the district court issued its decision on the constitutionality of the challenged statements. The court then granted Corbett's motion to amend the scheduling order and granted him leave to amend his answer to plead the defense of qualified immunity. The district court did not abuse its discretion by permitting these amendments.

[2] First, we consider whether the district court abused its discretion in granting Corbett's motion to amend the scheduling order. "A schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The district court "is given broad discretion in supervising the pretrial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order . . . will not be disturbed unless

they evidence a clear abuse of discretion." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir. 1992) (omission in original) (internal quotation marks omitted); *see also Noyes v. Kelly Servs.*, 488 F.3d 1163, 1174 n.6 (9th Cir. 2007); *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002). "[T]he focus of the inquiry is upon the moving party's reasons for seeking modification." *Johnson*, 975 F.2d at 609.

**[3]** The district court concluded there was good cause to permit the amendment because the gravamen of Farnan's case centered on allegations of a barrage of allegedly hostile remarks, and thus the tenor of the case changed significantly when the court decided on summary judgment that only a single statement violated the Establishment Clause. *See Farnan III*, 656 F. Supp. 2d at 1193. The district court did not abuse its discretion in concluding that this event, rather than any bad faith or dilatory purpose, motivated Corbett's request, and that Corbett thus did not unduly delay. *See id.* at 1198. We also credit the district court's determination that the amendment "created no meaningful case management issues" and did not "infringe[ ] on the efficient adjudication" of the litigation because "[t]he qualified immunity determination is a question of law . . . based on the factual record already developed." *Id.* at 1197. No additional discovery was necessary and no delay ensued. *See id.* Indeed, in *Graves v. City of Coeur D'Alene*, we saw fit to raise the issue of qualified immunity sua sponte on appeal precisely because "[q]ualified immunity is an issue of law and, to the extent that it depends on the factual record, that record ha[d] [already] been fully developed." 339 F.3d 828, 845-46 & n.23 (9th Cir. 2003), *abrogated in part on other grounds by Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty.*, 542 U.S. 177 (2004).

**[4]** We also appreciate that the prejudice to Corbett from a failure to modify the order likely would be substantial. Although Farnan sought only nominal damages, the attorney's fees and costs for which Corbett could be liable absent the

protection of qualified immunity undoubtedly would be considerable after more than three years of litigation. *See Farnan III*, 656 F. Supp. 2d at 1199 (discussing *D'Aguanno v. Gallagher*, 50 F.3d 877, 881 (11th Cir. 1995)). In evaluating whether Farnan was prejudiced, we note that he was put on notice that qualified immunity was at issue when the intervenors raised the defense on Corbett's behalf in their answer, long before the parties filed their motions for summary judgment.[4] In addition, a plaintiff does not establish prejudice even when the timely assertion of an affirmative defense would have been dispositive had it been asserted at the outset of the suit. *See Owens*, 244 F.3d at 713. In any event, the district court noted that "Corbett would very likely not have succeeded on a qualified immunity defense early on," so even if he had raised the defense in his motion for summary judgment, "the Court would have nevertheless considered the issue of whether a constitutional violation occurred." *Farnan III*, 656 F. Supp. 2d at 1199. We therefore conclude that the district court did not abuse its discretion under Rule 16 by permitting the amendment to the scheduling order. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000); *Johnson*, 975 F.2d at 607-08.

[5] The district court also did not abuse its discretion under Rule 15 by allowing Corbett to amend his answer. Rule 15(a) provides that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "This policy is 'to be applied with extreme liberality.' " *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting *Owens*, 244 F.3d at 712). "Absent prejudice, or a strong showing of any of the remaining *Foman* [*v. Davis*, 371 U.S. 178 (1962)] factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Id.*[5] Corbett

---

[4]We do not decide that an intervenor may raise a defense on behalf of another party, but mention the intervenors' answer only in terms of notice to Farnan of Corbett's potential defense.

[5]The *Foman* factors include "[1] undue delay, bad faith or dilatory motive on the part of the movant, [2] repeated failure to cure deficiencies

had not previously amended his answer and the amendment was not futile. Further, as we have explained, there was no undue delay, bad faith, dilatory motive or undue prejudice to Farnan. *See Waldrip v. Hall*, 548 F.3d 729, 732-33 (9th Cir. 2008); *Owens*, 244 F.3d at 712. The district court thus did not abuse its discretion. We therefore turn to the merits of Corbett's qualified immunity defense.

## B.

### 1.

The Establishment Clause applies "not only to official condonement of a particular religion or religious belief, but also to official disapproval or hostility toward religion." *Am. Family Ass'n v. City & Cnty. of S.F.*, 277 F.3d 1114, 1120-21 (9th Cir. 2002); *see also McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) ("[The Establishment Clause] mandates governmental neutrality between . . . religion and nonreligion." (internal quotation marks omitted)). The Supreme Court has long made clear, however, that "the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma." *Epperson v. Arkansas*, 393 U.S. 97, 106 (1968). Even statements exhibiting some hostility to religion do not violate the Establishment Clause if the government conduct at issue has a secular purpose, does not have as its principal or primary effect inhibiting religion and does not foster excessive government entanglement with religion. *See Am. Family*, 277 F.3d at 1121; *see also Edwards v. Aguillard*, 482 U.S. 578, 583 (1987); *Lemon v. Kurtzman*, 403 U.S. 602 (1971).

---

by amendments previously allowed, [3] undue prejudice to the opposing party by virtue of allowance of the amendment, [and] [4] futility of amendment." *Eminence Capital*, 316 F.3d at 1052 (quoting *Foman*, 371 U.S. at 182) (internal quotation marks omitted).

**[6]** In evaluating a grant of qualified immunity, we ask two questions: (1) whether, taking the facts in the light most favorable to the nonmoving party, the government official's conduct violated a constitutional right, and (2) whether the right was clearly established at the time of the alleged misconduct. *See Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808 (2009). If the answer to either is "no," the official cannot be held liable for damages. *See id.* We may address the second question first, particularly where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson*, 129 S. Ct. at 818. We have little trouble concluding that the law was not clearly established at the time of the events in question — there has never been any reported case holding that a teacher violated the Establishment Clause by making statements in the classroom that were allegedly hostile to religion. Because the district court's judgment must be affirmed on that basis, we decline to consider the constitutionality of Corbett's statements, and we vacate the district court's decision to the extent it decided the constitutionality of any of Corbett's statements. *See id.* at 815-18.

## 2.

**[7]** "[G]overnmental officials . . . generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001) (omission in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)) (internal quotation marks omitted). In evaluating whether a right is clearly established, we look to the state of the law at the time of the incident in question. *See Bryan v. MacPherson*, 630 F.3d 805, 832 (9th Cir. 2010). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creigh-*

*ton*, 483 U.S. 635, 640 (1987)) (internal quotation marks omitted). Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S. Ct. 2074, 2083 (2011). That standard is not met here — nothing put Corbett on notice that his statements might violate the Establishment Clause. *See Hope v. Pelzer*, 536 U.S. 730, 739-41 (2002); *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1136-37 (9th Cir. 2003).

**[8]** The Supreme Court has recently reiterated that we must not "define clearly established law at a high level of generality" when analyzing whether the qualified immunity standard is met. *Al-Kidd*, 131 S. Ct. at 2084. Rather, the right alleged to have been violated must be defined in a " 'more particularized' " manner than, for example, "the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier*, 533 U.S. at 201-02 (quoting *Anderson*, 483 U.S. at 640). That is the fundamental problem with Farnan's contention that qualified immunity does not protect Corbett. Farnan asserts that "[i]t has been clearly established for many years that the government must remain neutral with regard to religion, and it may not show its disapproval of religion." This overbroad proposition, "cast at a high level of generality," is just the sort of sweeping statement of the law that is inappropriate for assessing whether qualified immunity applies. *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam); *see also al-Kidd*, 131 S. Ct. at 2084; *Saucier*, 533 U.S. at 202-01. Instead, the issues must be characterized with greater specificity. *See, e.g.*, *Brousseau*, 543 U.S. at 200 (defining the relevant inquiry as whether it was a clearly established Fourth Amendment violation "to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight"); *Fogel v. Collins*, 531 F.3d 824, 833 (9th Cir. 2008) (holding that qualified immunity was warranted where there "was no reported case in which a person in the post-September 11 environment satir-

ically proclaimed himself or herself to be a terrorist in possession of weapons of mass destruction").

**[9]** Considering a more precise, and therefore relevant, definition of the question at stake in this case suggests why Farnan has sought to frame the issue so broadly: nothing in the law would make clear to a reasonable person that he might violate the Establishment Clause by making the challenged statements in the context of a classroom discussion in an Advanced Placement history course. Even as a general matter, precedent on the Establishment Clause is scarce and we "have little guidance concerning what constitutes a primary effect of inhibiting religion." *Am. Family*, 277 F.3d at 1122; *see also Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1256 (9th Cir. 2007) (same). More to the point, we are aware of no prior case holding that a teacher violated the Establishment Clause by appearing critical of religion during class lectures, nor any case with sufficiently similar facts to give a teacher "fair warning" that such conduct was unlawful. *Flores*, 324 F.3d at 1136-37; *see also al-Kidd*, 131 S. Ct. at 2084.

The only cases that Farnan argued in his briefs clearly establish the law in the relevant educational context involve claims that school officials were *promoting* religion rather than expressing hostility toward it, and challenge *systemic* actions such as state laws and school district policies rather than parsing individual teachers' classroom discussions. *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15-18 (2004) (holding that a father lacked standing to challenge school district policy requiring teacher-led recitation of the Pledge of Allegiance in his daughter's kindergarten class); *Epperson*, 393 U.S. at 104-08 (holding that Arkansas statutes prohibiting the teaching of evolution in public schools violated the Establishment Clause); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223-25 (1963) (holding that state laws requiring the reading of Bible verses and recitation of the Lord's Prayer in public school classes violated the Establishment Clause). At oral argument, Farnan's counsel conceded

that there is no case directly on point, but argued that the general principles gleaned from the cases cited in his briefs, and from cases involving claims of hostility to religion in noneducational contexts, are sufficient to clearly establish the law. We cannot agree.

The Supreme Court has long recognized the importance of protecting the "robust exchange of ideas" in education, "which discovers truth 'out of a multitude of tongues.' " *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (quoting *United States v. Associated Press, D.C.*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding . . . ." *Id.* (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)) (internal quotation marks omitted); *see also* Nat'l Sch. Bds. Ass'n, School Board Policies on Academic Freedom 2, 5 (1973) ("Academic freedom is an essential for responsible teachers. . . . To prepare students for adult roles in a democratic society, teachers and the schools must try to maintain an atmosphere of free inquiry."). This academic freedom will sometimes lead to the examination of controversial issues. Both parties agree that AP Euro could not be taught without discussing religion. We have no doubt that the freedom to have a frank discussion about the role of religion in history is an integral part of any advanced history course. Indeed, a collective of organizations including the American Association of School Administrators, American Federation of Teachers, National Education Association and National School Boards Association, has long acknowledged that "[b]ecause religion plays a significant role in history and society, study about religion is essential to understanding both the nation and the world." *Religion in the Public School Curriculum: Questions and Answers*, 8 J.L. & Religion 309, 310 (1990); *see also* Tenn. Educ. Ass'n, A Teacher's Guide to Religion in the Public Schools 2 (2008) (same).

**[10]** In broaching controversial issues like religion, teachers must be sensitive to students' personal beliefs and take

care not to abuse their positions of authority. *See Edwards*, 482 U.S. at 584 ("Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family."). But teachers must also be given leeway to challenge students to foster critical thinking skills and develop their analytical abilities. This balance is hard to achieve, and we must be careful not to curb intellectual freedom by imposing dogmatic restrictions that chill teachers from adopting the pedagogical methods they believe are most effective. *Cf. Keyishian*, 384 U.S. at 604. At some point a teacher's comments on religion might cross the line and rise to the level of unconstitutional hostility. But without any cases illuminating the " 'dimly perceive[d] . . . line[ ] of demarcation' " between permissible and impermissible discussion of religion in a college level history class, we cannot conclude that a reasonable teacher standing in Corbett's shoes would have been on notice that his actions might be unconstitutional. *Mueller v. Allen*, 463 U.S. 388, 393 (1983) (quoting *Lemon*, 403 U.S. at 612). We therefore affirm the district court's decision that Corbett was entitled to qualified immunity.

## CONCLUSION

**[11]** "[T]he Establishment Clause presents especially difficult questions of interpretation and application," and we cannot expect Corbett to have divined the law without the guidance of any prior case on point. *Id.* at 392. Because we conclude that Corbett is entitled to the protection of qualified immunity, we affirm the district court's judgment granting qualified immunity. Because we do not reach the constitutionality of any of Corbett's statements, we vacate the district court's judgment in that respect. Each party shall bear its own costs on appeal.

**AFFIRMED in part, VACATED in part.**