O’Donnell, J.,
dissenting.
{¶ 140} The right of free speech of public school teachers and their students and the freedom of a public school teacher to select and utilize teaching materials and methods to effectively present the prescribed school curriculum are the core issues in this case. It involves a veteran science teacher singled out by the Mount Vernon City School District Board of Education because of his willingness to challenge students in his science classes to think critically about evolutionary theory and to permit them to discuss intelligent design and to debate creationism in connection with the presentation of the prescribed curriculum on evolution. It is not about marking a cross on a student’s arm with a Tesla coil, nor, as viewed by the majority, a simple case of teacher insubordination. We accepted jurisdiction on two propositions of law, which present issues of constitutional magnitude:
[I] The termination of a public school teacher’s employment contract based on the teacher’s use of academic freedom where the school board has not provided any clear indication as to the kinds of materials or teaching methods which are unacceptable cannot be legally justified, as it constitutes an impermissible violation of the rights of the teacher and his students to free speech and academic freedom under the First Amendment to the United States Constitution and a manifestation of hostility toward religion in violation of the First Amendment’s Establishment Clause.
[II] The termination of a public school teacher’s employment contract based on the mere presence of religious texts from the school’s library and/or the display of a patriotic poster cannot be legally justified, as it constitutes an impermissible violation of the rights of a teacher and his students to free speech and academic freedom under the First Amendment *504 to the United States Constitution and a manifestation of hostility toward religion in violation of the First Amendment’s Establishment Clause.
Because the majority resolves this case by finding that sufficient evidence exists to support just cause for termination and fails to examine the constitutional issues, I respectfully dissent.
Insubordination
{¶ 141} John Freshwater served with distinction as a teacher in the Mount Vernon City School District for more than 20 years. Prior to his termination by the board of education, he had received overwhelmingly positive performance reviews and, as acknowledged in the referee’s report issued after a protracted hearing in this matter, he had been “recognized by his peers for his outstanding teaching skills.” In addition, the record reflects, he had never been subject to any formal discipline by school administrators.
{¶ 142} In December 2007, one of his students, Z.D., complained about the use of a Tesla coil that marked his arm with what appeared to be an “X” or a cross. After Z.D.’s parents complained, William White, the school principal, resolved the matter by instructing Freshwater not to use the Tesla coil on students and to secure it when not in use. That directive, however, did not satisfy the student’s parents, and in April 2008, through counsel in a letter to district Superintendent Stephen Short, they threatened to sue the board of education if it did not order Freshwater to remove Bibles and religious displays from the classroom by April 18, 2008, and if it did not suspend him from teaching pending an investigation.
{¶ 143} In an apparent response to the threatened litigation, White instructed Freshwater by letter that “all religious items need to be removed from your classroom by the end of the day on Wednesday, April 16, 2008. Bibles and other religious DVD’s, videos, etc. should also be placed out of sight and access of the students by this date.” Despite the fact that he had been singled out and that other teachers and administrators had Bible verses or other religious references on display in their rooms, Freshwater removed copies of the Ten Commandments from the walls in his classroom, together with at least ten inspirational posters containing Bible verses, various religious DVDs and videos, and boxes of Bibles used by the Fellowship of Christian Athletes, a school-sanctioned organization that he monitored and allowed to meet in his classroom. The only items that remained at the end of the day on April 16 were his personal Bible, a religious book and a Bible from the school’s library, and a poster of President George W. Bush and his cabinet captioned, “The effectual fervent prayer of a righteous man availeth much,” James 5:16, which had been distributed by the school and which other teachers and colleagues displayed in their classrooms and offices at the school.
*505 {¶ 144} The board concluded that by having his personal Bible, the school library books, and the school-issued poster in his classroom, Freshwater “acted in defiance of direct instructions and orders of the administrators.” The board then stated, “Freshwater was directed to remove or discontinue the display of all religious articles in his classroom, including all posters of a religious nature, and * * * has failed to comply with that directive and, further, has brought additional religious articles into his classroom, in a direct act of insubordination.” That finding is wrong and is not supported by the record. Notably, White’s letter did not instruct Freshwater to remove all religious articles from his classroom, as the board stated. The principal testified that he told Freshwater that “certainly he may read his Bible during his own time, but during the times that students were in the classroom it was supposed to be, you know, out of sight and put away from the students.” White also informed Freshwater that “other religious DVD’s, videos, etc. should also be placed out of sight and access of the students.” Lacking in the record is any indication that any students were present in the classroom when White inspected it on April 16 or that students had access to them. The conclusion that Freshwater defiantly violated the directive is subjective — especially because Freshwater had permission to read his own Bible and the two other books in his classroom came from the school’s own library.
{¶ 145} The lead opinion recognizes that Freshwater had a constitutional right to keep his Bible on his desk and that he was not insubordinate for doing so and could not be terminated on that basis, yet it concludes that he had no First Amendment right to have the copies of the Oxford Bible or Jesus of Nazareth from the school library in his classroom, because these books were not a part of his personal religious exercise. But this is a specious argument and a distinction without a difference. The conclusory statement in the lead opinion that Freshwater was defiant because he had these library books in his classroom is unwarranted. He explained that at the time he checked these books out, he “was expecting my Bible to be removed out of my classroom. And my daughter and I would walk in — my daughter would always open it up and say, Dad, it’s still there, Dad, it’s still there. That’s my inspiration. I’m not going to go without my inspiration.” He testified that he checked these books out of the library for two reasons:
[O]ne, I was curious about if the library had them. I wanted to look at them. And I found some interesting information.
Q. Okay.
A. So it was a curiosity. Two, it’s my inspiration. I thought that someday, after the 16th and on, that my Bible would be removed out of my classroom, so I would have the Oxford [Bible] from the school library *506 there. And my thinking was they’re not going to remove the school library Bible.
* * *
* * * My point would be, again, inspirational. I want to have a Bible on my desk. They’re not going to take the school library Bible off my desk. That was my thinking at the time.
{¶ 146} Thus, his purpose for having the school Bible on a lab table in his classroom had nothing to do with being defiant or insubordinate. As an individual who read his Bible during his personal time for inspiration and moral growth, he did not want to be deprived of that opportunity if the school authorities confiscated his personal Bible. The school board could not constitutionally preclude Freshwater from seeking religious inspiration from the school library’s Oxford Bible or its book Jesus of Nazareth. Rather, the analysis articulated by the lead opinion in holding that Freshwater had a First Amendment right to have his personal copy of a Bible at his desk also applies to the books he withdrew from the school library, because his purpose for doing so is protected by the Free Exercise Clause of the First Amendment. The presence of these school library books in the classroom cannot reasonably be viewed as an official endorsement of religion, because they are the school’s own books, and thus does not justify the school board’s action that encroached on Freshwater’s constitutional right to personal religious exercise, let alone justify discharging him for insubordination because he had them in the classroom.
{¶ 147} Nor did Freshwater have any reason to believe that he had to remove the poster of President Bush and his cabinet, because he considered it to inspire patriotism, not religion, and it had been provided to him by the school. In addition, other members of the faculty had the same poster on display in their classrooms and offices — including Dino D’Ettore, Ben Sanders, David Carter, Brian Gastin, and Timothy Keib — apparently none of whom had been ordered to remove it from display. Carter kept the poster in his office long after the board resolved to terminate Freshwater for not removing it. And faculty members testified that in their view, the poster was not a religious display. Seventh grade teacher Lori Miller thought, “[W]hat an awesome poster to see men that are— that have so much power having a moment of humbleness or weakness or — you know, I just thought that was great for — especially for middle school kids to see powerful men kind of taking a time out.” Former interim principal Timothy Keib called the poster “non-religious”; former middle school principal Jeff Kuntz “didn’t look at it as a religious poster”; and intervention specialist Andrew Thompson saw it as depicting “the leader of the country and not necessarily religious connections.”
*507 {¶ 148} Thus, based on this and other evidence, Freshwater did not act in defiance of instructions and orders of school administrators when he failed to remove his personal Bible, school library books, or the poster of President Bush and his cabinet that the school had provided him. The conclusion that Freshwater was insubordinate for failing to remove these items is not supported by the evidence, which demonstrates that the school board singled him out to avoid defending itself against a threatened lawsuit. This is not a valid basis to terminate the teaching contract of a veteran science teacher with skill and talent whose students demonstrated their level of curriculum comprehension by their scores on the Ohio Achievement Test.
Academic Freedom
{¶ 149} The remaining cause asserted for terminating Freshwater is that he “injected his personal religious beliefs into his plan and pattern of instructing his students” by exceeding the bounds of all pertinent bylaws and policies of the Mount Vernon City School District. The board referenced Freshwater’s instruction on evolution as injecting Christian religious principles of creationism and intelligent design.
{¶ 150} Notably, the referee in this case rejected any claim that Freshwater failed to teach any material, including evolution, as required by the Academic Content Standards, and the referee found that Freshwater’s students met or exceeded the expectations for eighth grade science students regarding such mandatory subject areas.
{¶ 151} And the Bylaws and Policies of the Mount Vernon City School District provide:
The Board of Education believes that the consideration of controversial issues has a legitimate place in the instructional program of the schools.
Properly introduced and conducted, the consideration of such issues can help students learn to identify important issues, explore fully and fairly all sides of an issue, weigh carefully the values and factors involved, and develop techniques for formulating and evaluating positions.
For purposes of this policy, a controversial issue is a topic on which opposing points of view have been promulgated by responsible opinion.
The Board will permit the introduction and proper educational use of controversial issues provided that their use in the instructional program:
A. is related to the instructional goals of the course of study and level of maturity of the students;
*508 B. does not tend to indoctrinate or persuade students to a particular point of view;
C. encourages open-mindedness and is conducted in a spirit of scholarly inquiry.
Controversial issues related to the program may be initiated by the students themselves provided they are presented in the ordinary course of classroom instruction and it is not substantially disruptive to the educational setting.
{¶ 152} The Academic Content Standards as promulgated by the State Board of Education and the Ohio Department of Education do not provide a script that teachers are required to follow when teaching core requirement subjects. Rather, the Ohio Department of Education explains that in standards-based instruction,
teachers start with the state standards as the basis for classroom instructional planning, rather than starting with a textbook or other classroom materials. Teachers select a unit of instruction that meets the standards, benchmarks and indicators and use the standards to determine how the unit shall be designed, assessed, delivered and evaluated.
Ohio Department of Education, What Does Standards-Based Instruction Look Like?, http://ims.ode.state.oh.us/ODE/IMS/Lessons/FAQ/planning_standards_ based-instruction_what_doesmt_look_like.asp (accessed Sept. 3, 2013). Several teachers at Mount Vernon Middle School testified that they were given “wide latitude” in planning their classes. One teacher explained that this allowed lesson plans to include “[wjhatever * * * would enhance that standard and * * * would help the students be successful in learning the concept.” Thus, Freshwater too enjoyed wide latitude in the realm of academic freedom to teach his classes in the manner he felt most effective and had the discretion to supplement the lessons with handouts and movies.
{¶ 153} Importantly, teachers in public schools have a First Amendment interest in choosing a particular pedagogical method for presenting the material in the official curriculum to students. The United States Supreme Court first recognized the academic freedom of teachers in a series of cases arising from efforts to purge Communists and subversives from college campuses. See, e.g., Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (“Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization *509 will stagnate and die”); Barenblatt v. United States, 360 U.S. 109, 112, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959) (“When academic teaching-freedom and its corollary learning-freedom, so essential to the well-being of the Nation, are claimed, this Court will always be on the alert against intrusion by Congress into this constitutionally protected domain”).
{¶ 154} In Keyishian v. Bd. of Regents of Univ. of State of New York, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), members of the faculty of a state university challenged state laws that disqualified those who advocated the overthrow of government by force, including members of the Communist Party, from teaching. The court held that the laws chilled the exercise of First Amendment rights by not clearly informing teachers what conduct was prescribed, and it stated: “Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.” Id. at 603. The court emphasized that “ ‘[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.’ ” Id., quoting Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).
{¶ 155} Although these prior cases dealt with academic freedom in universities and colleges, the court in Epperson v. Arkansas, 393 U.S. 97, 107, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), applied this precedent to a state statute that barred school teachers from teaching evolutionary theory. Relying on Keyishian in holding the statute unconstitutional, the court explained,
The State’s undoubted right to prescribe the curriculum for its public schools does not carry with it the right to prohibit, on pain of criminal penalty, the teaching of a scientific theory or doctrine where that prohibition is based upon reasons that violate the First Amendment. It is much too late to argue that the State may impose upon the teachers in its schools any conditions that it chooses, however restrictive they may be of constitutional guarantees.
{¶ 156} Thus, as the Supreme Court of Colorado observed in State Bd. for Community Colleges & Occupational Edn. v. Olson, 687 P.2d 429, 437 (Colo. 1984),
a teacher in a public educational institution has a constitutionally protected First Amendment interest in choosing a particular pedagogical method for *510 presenting the idea-content of a course, as long as the course is part of the official curriculum of the educational institution and the teaching method serves a demonstrable educational purpose.
{¶ 157} The academic freedom of teachers also extends to the teaching of controversial subjects. It is recognized that “teachers at public institutions may not be forced to surrender their rights to speak out on controversial issues as a condition of their employment.” 2 Rodney A. Smolla, Smolla and Nimmer on Freedom of Speech, Section 17:32 (2013); accord Dube v. State Univ. of New York, 900 F.2d 587, 597 (2d Cir.1990) (explaining that the denial of tenure or promotion in retaliation for controversial teachings viewed by some observers as racist violates the First Amendment). In accord with the principle, the Seventh Circuit Court of Appeals noted in Zykan v. Warsaw Community School Corp., 631 F.2d 1300, 1305-1306 (7th Cir.1980), that local school boards may not place “a flat prohibition on the mention of certain relevant topics in the classroom,” forbid “students to take an interest in subjects not directly covered by the regular curriculum,” or take actions “guided by an interest in imposing some religious or scientific orthodoxy or a desire to eliminate a particular kind of inquiry generally.”
{¶ 158} More recently, in C.F. ex rel. Farnan v. Capistrano Unified School Dist., 654 F.3d 975 (9th Cir.2011), the Ninth Circuit Court of Appeals considered a claim that a teacher violated the Establishment Clause by making controversial comments in class that were hostile to religion in general and to Christianity in particular. The court noted, “we are aware of no prior case holding that a teacher violated the Establishment Clause by appearing critical of religion during class lectures, nor any case with sufficiently similar facts to give a teacher ‘fair warning’ that such conduct was unlawful.” Id. at 987. And holding that the teacher lacked notice that the comments might violate the Establishment Clause, the court explained:
The Supreme Court has long recognized the importance of protecting the “robust exchange of ideas” in education, “which discovers truth ‘out of a multitude of tongues.’ ” Keyishian v. Bd. of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (quoting United States v. Associated Press, 52 F.Supp. 362, 372 (S.D.N.Y.1943)). “Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding * * *.” Id. (quoting Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957)) (internal quotation marks omitted) * * *. This academic freedom will sometimes lead to the examination of controversial issues. * * *
*511 In broaching controversial issues like religion, teachers must be sensitive to students’ personal beliefs and take care not to abuse their positions of authority. * * * But teachers must also be given leeway to challenge students to foster critical thinking skills and develop their analytical abilities. This balance is hard to achieve, and we must be careful not to curb intellectual freedom by imposing dogmatic restrictions that chill teachers from adopting the pedagogical methods they believe are most effective.
(Citations omitted.) Id. at 988.
{¶ 159} However, the academic freedom of teachers is not without limit. Local school boards are vested with the authority to establish the curriculum and the responsibility to ensure that teachers do not “stray from the established curriculum by injecting religious advocacy into the classroom,” such as by teaching creationism in violation of the Establishment Clause. Webster v. New Lenox School Dish No. 122, 917 F.2d 1004, 1007 (7th Cir.1990); accord Edwards v. California Univ. of Pennsylvania, 156 F.3d 488, 492 (3d Cir.1998) (holding that academic freedom did not permit professor’s classroom tools to inject religious ideals in curriculum materials in contravention of university dictates); Piggee v. Carl Sandburg College, 464 F.3d 667 (7th Cir.2006) (upholding decision not to renew contract of teacher who injected her religious views in cosmetology classes); Helland v. S. Bend Community School Corp., 93 F.3d 327, 331-332 (7th Cir.1996) (concluding that substitute teacher could be removed from list of approved substitutes for failing to follow lesson plans and discussing creationism in a fifth grade science class); Peloza v. Capistrano Unified School Dist., 37 F.3d 517, 521-522 (9th Cir.1994) (holding that biology teacher could be required by the school board to teach evolution and precluded from discussing religion with students).
{¶ 160} But presenting alternative views on scientific theories as a means of challenging students to think critically is not tantamount to promoting religion in the classroom, a fact that the Supreme Court recognized in Edwards v. Aguillard, 482 U.S. 578, 594, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), when it stated that “teaching a variety of scientific theories about the origins of humankind to schoolchildren might be validly done with the clear secular intent of enhancing the effectiveness of science instruction.”
{¶ 161} The record includes testimony from several teachers and reveals that Freshwater began the school year by teaching his students the scientific method and encouraging them to think critically and to distinguish between scientific hypothesis and established fact. Teaching students these critical analytic skills serves a secular purpose, not a religious one, and notably, the school district *512 curriculum recognized that it is beneficial for science students to learn how to critically analyze aspects of scientific theory, including the theory of evolution. At the time Freshwater taught science, the Academic Content Standard for Grade 6-8 science required students to be able to “[e]xplain why it is important to examine data objectively and not let bias affect observations.” According to prior standards for life sciences, by the time students completed tenth grade, they should have understood “how scientists continue to investigate and critically analyze aspects of evolutionary theory.”
{¶ 162} Also, the Mount Vernon City School District Bylaws and Policies allowed teachers to address controversial issues that arose while teaching the curriculum, and an administrative guideline for that policy directed teachers to “help students use a critical thinking process * * * to examine different sides of an issue.” Evolution is a controversial topic, as Freshwater’s fellow eighth grade science teacher, Elle Button, recognized when she testified that students in her class “would question greatly the validity of the theory of evolution.” Freshwater permitted his students to raise these questions and also to debate among themselves evolution, intelligent design, and creationism, but he did not participate in those debates. Notably, special education teacher Kerri Mahan, who observed these debates in Freshwater’s classroom, testified that the students led the debates and that Freshwater stepped in only when necessary to maintain decorum.
{¶ 163} Further, the evidence vindicates Freshwater’s teaching methods because it demonstrates that his students learned evolutionary theory as mandated by the official curriculum. Notably, among the building’s three eighth grade science teachers for the 2007-2008 academic year — the last year Freshwater taught at Mount Vernon Middle School — only Freshwater exceeded the state goal of 75 percent of his students passing the science portion of the Ohio Achievement Test. Even more striking is the fact that 89 percent of his students passed the life science section, which assessed, among other topics, students’ knowledge of evolutionary theory. In contrast, the students of the other two eighth grade science teachers achieved passage rates of 76 and 67 percent on this section.
{¶ 164} Deborah Strouse, the school district’s achievement coordinator, explained that this passage rate shows that Freshwater “did teach the indicators” contained in the Academic Content Standards. Similarly, Mahan, who also served as the school achievement coach for education, agreed that the Ohio Achievement Test is “a good indicator of what the kids are actually learning” because the test is based on the standards. Mahan also suggested that Freshwater’s approach to teaching critical thinking skills in science may have benefited his students on the Ohio Achievement Test because the test assesses “abstract thinking, synthesis, [and] evaluation.”
*513 {¶ 165} In addition to this objective evidence, Mahan, who regularly attended Freshwater’s classes for almost six years with her special education students, remembered him teaching the evolution section in the textbook. And Andrew Thompson, an intervention specialist who also attended Freshwater’s classes, disputed the media’s portrayal of Freshwater as “a crazy science teacher who the rest of the staff did not care for or respect” and expressed the opinion that Freshwater taught evolution effectively.
{¶ 166} Further, the record shows that Freshwater did not teach students creationism or intelligent design, either as a substitute for or an alternative to the theory of evolution. The best evidence in the case is Freshwater’s own testimony: “I' do not teach intelligent design. * * * I teach evolution. I do not teach ID or creationism.” He denied attempting to indoctrinate students, nor did he inject his personal religious beliefs into his lessons, explaining: “I do not want creationism taught in the schools. * * * [CJreationism is based on faith. Science is based on scientific method. * * * I wouldn’t want my students or my own personal kids to be taught in the schools by somebody that didn’t understand or didn’t — didn’t understand creationism.”
{¶ 167} His students and colleagues corroborated his testimony. Various former students testified that Freshwater had never taught creationism or intelligent design in class. For instance, a classmate of the student whose parents threatened to sue the district testified that Freshwater never referred to his Bible in class and never said anything about God, intelligent design, or creationism in the classroom, and she even noted that Freshwater changed the subject when a student brought up a “higher power.” Three other classmates testified that Freshwater did not teach the Bible or his religious beliefs in class, and another agreed that Freshwater did not promote creationism or intelligent design. Mahan, who brought her special education students for inclusion into Freshwater’s science class, stated that during the six years she attended his classes, Freshwater taught evolution without mentioning intelligent design to the students. Thompson, who also often attended Freshwater’s classes as an intervention specialist, testified that he never witnessed Freshwater teach creationism or intelligent design, and former interim principal Keib observed that he never saw Freshwater “try to push his faith or his philosophical beliefs on anybody that was a student.”
{¶ 168} And when Freshwater proposed changing the curriculum in 2003 to adopt an Objective Origins Science Policy, his proposal sought only to “[e]ncourage the presentation of scientific evidence regarding the origins of life and its diversity objectively and without religious, naturalistic, or philosophic bias or assumption.” (Emphasis added.) As Freshwater explained, he meant “to take a tenth grade standard and put it down to the eighth grade standard to critically *514 analyze evolution.” Like the tenth grade standard, his proposal distinguished the secular method of critically examining evolution from teaching intelligent design, and Freshwater confirmed that he did not intend that the proposed standard permit the teaching of religious concepts in science class.
{¶ 169} Thus, the evidence in this case reveals that the school board has misintérpreted Freshwater’s effort to challenge students to think critically about evolutionary theory and instead construed his instruction as promoting intelligent design from a creationist perspective. This is a misimpression and contrary to the evidence in this case, and it is not a basis to terminate the contract of a teacher.
{¶ 170} The school board concluded that Freshwater had injected his personal religious beliefs into his plan and pattern of instruction. It apparently assumed that he could not fairly present lessons on evolution and stated that he “not only injected his subjective, biased, Christian religion based, non-scientific opinion into the instruction of eighth grade science students but also gave those students reason to doubt the accuracy and or veracity of scientists, science textbooks, and/or science in general.” Yet student scores on standardized tests stand as strong, persuasive evidence of the board’s faulty conclusion; those scores instead reveal that Freshwater did teach evolution as mandated by the curriculum. Moreover, teaching students to question and rethink accepted scientific theories is essential to their understanding of the scientific method, the key concept his science students learned in eighth grade. As the United States Supreme Court recognized in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), “arguably, there are no certainties in science,” and “'scientists do not assert that they know what is immutably “true” — they are committed to searching for new, temporary, theories to explain, as best they can, phenomena.’ ” Id., quoting Brief for Nicolaas Bloembergen et al. as Amici Curiae at 9. Thus, there is nothing unscientific in Freshwater challenging students to critically evaluate and question the underlying premises of any scientific theory, including evolution.
{¶ 171} In the last analysis, it is apparent that the board has taken separate, isolated instances when Freshwater allegedly made religious statements sometime between 1994 and 2008 to demonstrate that he injected his personal religious beliefs into his plan and pattern of instruction in the 2007-2008 school year.[8] In 1994, Freshwater gave students information about a seminar support *515 ing the Biblical story of creation, and he also provided several handouts challenging evolutionary theory in 2002 or 2003 and in 2006 that the school board viewed as promoting intelligent design. And there is some evidence that Freshwater made off-hand remarks of a religious nature, including one reference to views on homosexuality mentioned by the school board in its termination resolution. In addition, Z.D. testified that sometime during the 2007-2008 school year, Freshwater referred to a “higher being” while discussing the Big Bang theory, suggested that the earth would come “to a fiery end” as foretold by the Bible, and said that Good Friday “should be called the greatest Friday or the best Friday ever.” But those isolated statements over an extended period of time do not establish a practice of injecting religious belief into his regular classroom instruction. As the Seventh Circuit Court of Appeals explained in Webster, 917 F.2d at 1007, “school boards may not fire teachers for random classroom comments.” This is especially true when, as here, the school board has not complained about religious statements or displays in classrooms of other teachers, but rather, has targeted this specific teacher only after he became the subject of a complaint and the board faced a threatened lawsuit.
{¶ 172} Teachers enjoy academic freedom to adopt the pedagogical methods they believe are most effective and are permitted to discuss controversial subjects with students related to the curriculum. Although local school boards have authority to establish the curriculum and may discipline teachers who stray from it by injecting religious advocacy in the classroom, they may not prohibit teachers from mentioning topics that are relevant to teaching the curriculum nor forbid students from considering issues not specifically prescribed by it.
{¶ 173} Thus, the school board violated Freshwater’s First Amendment rights when it terminated his contract based on its belief that he failed to adhere to the curriculum and that he was instead teaching creationism and intelligent design. Rather, the evidence demonstrates that he encouraged students to critique the theory of evolution to foster their critical thinking skills and to develop their analytical abilities, not to inject his religious beliefs into that instruction. Further, monitoring a student-led debate on evolution, providing handouts critical of evolutionary theory, and making isolated comments over a 20-year career that could be construed as religious does not establish that Freshwater taught creationism or intelligent design in the classroom. To the contrary, the evidence shows that Freshwater excelled in teaching evolutionary theory as part of the science curriculum for eighth grade students.
*516 The Law Office of R. Kelly Hamilton, L.L.C., and R. Kelly Hamilton; and the Rutherford Institute and Rita M. Dunaway, for appellant.
Britton Smith Peters & Kalail Co., L.P.A., David Kane Smith, Krista Keim, and Paul J. Deegan, for appellee.
Appignani Humanist Legal Center and William J. Burgess, urging affirmance for amici curiae American Humanist Association and the Secular Student Alliance.
Mayer Brown, L.L.P., Charles P. Hurley, Richard B. Katskee, and Scott M. Noveck, urging affirmance for amici curiae Americans United for Separation of Church and State and Anti-Defamation League.
Lape Mansfield & Nakasian, L.L.C., and Douglas M. Mansfield, urging affirmance for amici curiae Stephen Dennis and Jenifer Dennis.
Calfee, Halter & Griswold, L.L.P., Christopher S. Williams, Colleen M. O’Neil, and Jeffrey J. Lauderdale, urging affirmance for amicus curiae National Center for Science Education.
{¶ 174} Accordingly, this record neither demonstrates that Freshwater defied direct orders from school administrators, nor reflects that he taught creationism or intelligent design, nor shows that he strayed from the established curriculum on evolution. The claim of insubordination is not proven by clear and convincing evidence, which is “that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.” Cross v. Ledford, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). Thus, the school board lacked sufficient cause to terminate his contract. I would therefore reverse the judgment of the court of appeals and order his reinstatement with back pay.
{¶ 175} For these reasons, I respectfully dissent.
Pfeifer and Kennedy, JJ., concur in the foregoing opinion.

. Many of these incidents are not supported by record evidence. Administrators recalled that Freshwater distributed three “unauthorized” handouts between 2000 and 2007; the content of the first is unknown, the second could not be identified, and the problem with the third was that its source could not be documented. And although the board concluded that Freshwater used the movie Expelled: No Intelligence Allowed and the video The Watchmaker to challenge evolution, a *515 copy of Expelled does not appear in the record, and Freshwater did not show The Watchmaker in science class; rather, some of his science students saw it during a meeting of the Fellowship of Christian Athletes.